***********
Upon review of all of the competent evidence of record with references to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. On August 1, 2001, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between Carol Shingleton (hereafter "decedent") and defendant.
3. Defendant's third-party claim administrator is Crawford Company.
4. The dates of injury were on or about August 1, 2001 and allegedly May 22, 2002.
5. Plaintiff contends that decedent's average weekly wage at the time of the alleged injury on May 22, 2002 was $230.40.
6. The parties stipulated into evidence the following:
a. A Pre-Trial Agreement as Stipulated Exhibit No. 1.
b. Industrial Commission Forms as Stipulated Exhibit No. 2.
c. Discovery exchanged between the parties as Stipulated Exhibit No. 3.
d. Decedent's personnel file as Stipulated Exhibit No. 4.
e. Job description as Stipulated Exhibit No. 5.
f. February 14, 2003 letter from defendant's attorney to plaintiff's attorney as Stipulated Exhibit No. 6.
g. Print-out of benefits paid as Stipulated Exhibit No. 7.
h. Medical records from Wilson Medical Center as Stipulated Exhibit No. 8.
i. Medical records from Goldsboro Neurological Surgery as Stipulated Exhibit No. 9.
j. Medical records from Dr. Michael J. Kushner of Wilson Orthopaedic Surgery Neurology as Stipulated Exhibit No. 10.
k. Medical records from the Center for Scoliosis and Spinal Surgery as Stipulated Exhibit No. 11.
l. Medical records from Forest Hills Immediate Care as Stipulated Exhibit No. 12.
m. Medical records from Pro-Active Therapy, Inc. as Stipulated Exhibit No. 13.
n. Medical records from Eastern Radiologist, Inc. as Stipulated Exhibit No. 14.
o. Medical records from Wilson Regional MRI as Stipulated Exhibit No. 15.
p. Medical records from Brentwood Psychological as Stipulated Exhibit No. 16.
q. Medical records from Dr. Mark VanBree as Stipulated Exhibit No. 17.
r. Medical records from Dr. Michael Halpert as Stipulated Exhibit No. 18.
s. Medical records from Dr. Dudley Anderson as Stipulated Exhibit No. 19.
t. Decedent's U.S. Individual Tax Return Form 1940A for the year 2001 as Stipulated Exhibit No. 20.
7. Plaintiff contends the issues to be heard are: whether decedent suffered a back injury by specific traumatic incident on May 22, 2002; what additional medical benefits is decedent entitled to recover as a result of her injury; what is the appropriate sanction and/or penalty for defendant's failure to file appropriate Industrial Commission forms; whether plaintiff is entitled to benefits for a 25% permanent partial impairment of decedent's back as a result of her neck injury of August 1, 2001, and continued temporary total disability as a result of the low back injury of May 22, 2002.
8. Defendant contends that the issues to be heard are: whether plaintiff is entitled to additional benefits for decedent's August 1, 2001 injury; whether defendant is entitled to repayment or to a credit for medical benefits paid subsequent to June 9, 2003 for medical treatment for decedent's low back condition; and what is decedent's correct average weekly wage.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, decedent was 54 years old with a history of lumbar and abdominal cancer. Decedent was taking numerous medications related to the treatment of her cancer.
2. Decedent worked for defendant as a shift leader and her duties included assisting customers which required standing of up to two hours. Decedent was also required to perform stocking and cleaning duties, which were shared with the other employees on the crew. Lifting while stocking involved items such as a three-pound bag of children's toys or heavier items such as a five-gallon bucket of iced tea or lemonade. Decedent testified at the hearing that she made $8.25 per hour and worked between 28 and 35 hours per week. If decedent averaged 31.5 hours per week, then her average weekly wage would have been approximately $259.88 yielding a weekly compensation rate of $173.26. However, there is no evidence of record concerning the specific number of hours that decedent normally worked or averaged other than between 28 and 35 hours.
3. On approximately August 1, 2001, while lifting and emptying tea and lemonade containers, decedent sustained an injury by accident at work, resulting in upper extremity pain. Shortly thereafter, decedent reported her injury to her manager, Shemeika Draughn, who approved decedent's request to seek medical treatment and directed her to Forest Hills Immediate Care. Decedent's treatment was also authorized by the store's owner, Christy Proctor, who notified defendant-carrier of decedent's injury on August 15, 2001. Defendant treated decedent's claim as compensable and directed medical treatment; however, no forms were filed with the Commission and there is no evidence of record that defendant accepted liability in writing for decedent's claim. However, decedent had not yet missed any time from work as a result of her injury and defendant considered it a "medical only" claim.
4. On August 10, 2001, decedent initially sought treatment at the direction of defendant from Dr. Thomas Hooper with Forest Hills Immediate Care. Decedent completed a workers' compensation claim form, which indicated that she had been lifting boxes of tea and lemonade containers, which caused her to suffer pain from her left shoulder down her left arm into her hand and fingers with numbness of her index and middle fingers. Decedent also complained of neck pain on the left side with radiating pain down her arm. Decedent explained that her pain initially began in her right arm and shoulder but that it had shifted to the left arm and the posterior cervical area. Dr. Hooper diagnosed decedent with degenerative disc disease with a possible cervical strain and referred decedent for physical therapy. Dr. Hooper did not write decedent out of work. Decedent made no mention of low back pain when she saw Dr. Hooper but gave a detailed history of her injury, which caused pain from her neck and shoulder extending down her left arm into her fingers.
5. Decedent attended physical therapy at ProActive during August 2001 and continued to complain of neck and arm pain. Decedent continued to work for defendant and on August 20, 2001, decedent's physical therapist suggested that to facilitate decedent's recovery she work light duty for two to three weeks with lifting below ten pounds or with assistance if decedent lifted greater than ten pounds. Decedent continued to work. Thereafter, on August 27, 2001, decedent was again seen in physical therapy at which time she had continued difficulties and the therapist recommended additional lifting restrictions until further notice from a physician. Decedent continued to work for defendant.
6. On August 30, 2001, upon referral from Dr. Hooper, decedent saw Dr. Michael Kushner for a neurologic evaluation. Decedent reported an injury at work earlier that month and complained of arm pain and numbness in the second and third fingers of the left hand. Decedent also reported having difficulties in the right arm several months earlier. However, decedent made no mention of low back difficulties or a low back injury. Dr. Kushner noted that nerve conduction studies of the left arm were basically normal, and he recommended a wrist splint. Dr. Kushner did not remove decedent from work. Decedent returned to Dr. Kushner on October 4, 2001 complaining of shooting arm pain. Dr. Kushner was concerned about a cervical radiculopathy and prescribed a soft collar and recommended an MRI. Thereafter, on October 18, 2001 and January 16, 2002, decedent again returned to Dr. Kushner, who reviewed her MRI results, which revealed multiple disc changes but also motion related artifact. Dr. Kushner recommended a surgical consultation and a myelogram and diagnosed cervical radiculopathy. Dr. Kushner did not write decedent out of work. Once again, decedent did not complain of any low back problems or report a low back injury.
7. Dr. Kushner referred decedent to Dr. Scott Reeg at the Center for Scoliosis and Spinal Surgery in Greenville. Dr. Reeg evaluated decedent on February 19, 2002 at which time decedent reported a history of neck and arm pain, which began on the right and then moved to the left after heavy lifting at work. Decedent reported continuing to work for defendant-employer without missing any work but remaining careful with lifting activities. Decedent reported some tingling over the top of her left foot but did not complain of any significant lower extremity complaints. Decedent did not report a low back injury to Dr. Reeg. Dr. Reeg found slight atrophy of decedent's left triceps muscle and recommended a myelogram for surgical consideration due to her persistent symptoms.
8. On March 19, 2002, decedent returned to Dr. Reeg after undergoing a cervical myelogram, which revealed abnormalities on the left side and multi-level degenerative spondylosis. Dr. Reeg discussed treatment options including injection therapy or surgery. Decedent was given a light-duty work note and was to consider her treatment options. Again, decedent did not complain of any low back problems to Dr. Reeg. Thereafter, decedent continued to work for defendant-employer and did not seek medical treatment for approximately two months.
9. On May 22, 2002, decedent presented to Wilson Medical Center with back and left hip pain. Decedent reported a history of chronic back problems, secondary to "pinched nerves" in her neck, with an acute onset of pain that morning. However, decedent made no reference to an incident at work on May 22, 2002 and she was released to return to work without restrictions on May 23, 2002 with regard to her back condition. Despite being aware of and having previously followed company policy requiring the immediate reporting of all work-related injuries, decedent did not report any alleged May 22, 2002 incident to defendant-employer. While Ms. Proctor received a copy of the emergency room instructions from plaintiff's May 22, 2002 visit, Ms. Proctor did not know if decedent was claiming a new injury or if her complaints were related to her August 1, 2001 injury. Accordingly, Ms. Proctor did not make a report of a May 22, 2002 incident to defendant-carrier. Moreover, decedent did not file a claim for the alleged May 22, 2002 incident until December 18, 2002. The Form 18 that plaintiff filed for her alleged May 22, 2002 incident lists "aggravation of low back" as the nature and extent of the injury and indicates it was caused by "pushing boxes with feet" on May 22, 2002. Decedent returned to work on May 23, 2002 and continued to work following the alleged May 22, 2002 incident. Thereafter, decedent did not seek additional medical treatment for a month.
10. On June 10, 2002, decedent filed a Form 33 Request for Hearing based upon her August 1, 2001 injury and nerve damage to her neck on the grounds that defendant failed to authorize medical treatment and comply with the Act. Decedent's Form 33 makes no mention of a low back injury occurring on August 1, 2001 or of a second injury on May 22, 2002. At this time decedent had not yet begun to miss any work as a result of her neck injury. Defendant did not file a Form 33R until December 20, 2002 at which time they responded that decedent was receiving all benefits to which she was entitled.
11. On June 25, 2002, decedent returned to Dr. Reeg. Decedent reported continuing to work since her last visit and was experiencing severe left upper extremity pain with numbness and tingling. Decedent also reported some numbness and tingling in her left leg and foot but failed to report any work injury of May 22, 2002. Decedent demonstrated atrophy of her left arm and bilateral negative straight leg raise tests. Due to decedent's failed conservative treatment and complaints, Dr. Reeg recommended surgery for her cervical condition. Dr. Reeg removed decedent from work and anticipated that decedent could return to work light duty work four to six weeks following her surgery. Dr. Reeg made no recommendations with regard to decedent's left leg complaints.
12. On July 10, 2002, decedent returned to Forest Hills Immediate Care and was seen by nurse April Tolbert. Decedent complained of back pain radiating to her lower legs as well as neck pain. Decedent did not report an incident of May 22, 2002 but rather a notation was made in the records to refer back to the notes of August 10, 2001, which indicate the earlier injury. Decedent was prescribed medications and referred for a neurological consultation. Thereafter, Forest Hills Immediate Care mailed the workers' compensation claim to defendant-carrier on July 18, 2002.
13. On July 15, 2002, upon referral from Ms. Tolbert, decedent returned to Dr. Kushner who noted new complaints of back pain and leg radiculopathy. Dr. Kushner noted that decedent had previously been seen for cervical complaints, which were somewhat improved. Dr. Kushner found diffuse weakness of the left leg and felt that decedent had somatic preoccupation with her pain. Straight leg raise testing was negative. Decedent underwent nerve conduction studies of her left leg, which were normal. However, EMG studies revealed multiple radiculopathies. Dr. Kushner recommended medication and lumbar imaging, which was denied by defendant-carrier. Dr. Kushner felt that decedent's low back complaints were new. Decedent did not report an injury of May 22, 2002 but rather stated that her problems had been present "all along" and that her cervical spine had been the prior focus. However, the greater weight of the evidence of record fails to support decedent's contention, as decedent was quite specific concerning her early complaints to defendant as well as to her physicians.
14. On July 24, 2002, approximately one month after decedent was taken out of work for her neck condition by Dr. Reeg, an authorized physician, defendant began paying decedent continuing weekly benefits at a rate of $149.34 per week with a lump sum payment dating back to June 25, 2002 when Dr. Reeg first removed decedent from work. However, defendant failed to file an appropriate I.C. form at the time weekly payments were initiated. In addition, defendant did not file a Form 19. While it is clear that decedent had missed greater than one day of work, it is unclear at what time defendant paid medical expenses in excess of the requisite amount necessary to require the filing of a Form 19. Nevertheless, defendant eventually paid in excess of $25,000.00 in medical expenses for decedent's compensable neck injury and failed to file a Form 19 at any time.
15. On July 30, 2002, decedent returned to Dr. Reeg and reported improvement in her neck and arm condition. However, decedent complained of twitching in her toes while sitting. Dr. Reeg could find no significant neurological defects and discussed a modified return to work with decedent who was reluctant and disagreed due to her pain medications. Dr. Reeg also found decedent to be quite emotional and indicated that, considering the time since her injury and her new complaints, he no longer recommended surgery. Instead, Dr. Reeg recommended a modified return to work. As decedent and Dr. Reeg disagreed and because Dr. Kushner could no longer treat decedent, she was referred for a second opinion to Dr. Robert Lacin of Goldsboro Neurological Surgery.
16. On July 31, 2002, decedent was seen upon referral from her attorney for pain management with Brentwood Psychological. Decedent reported neck shoulder and arm pain radiating down her back and into her right leg with toe tingling on the left foot. Decedent reported an injury which occurred by lifting heavy containers of tea; however, decedent again failed to describe a second injury on May 22, 2002 involving pushing boxes with her feet.
17. On September 4, 2002, decedent was seen for a neurological second opinion evaluation by Dr. Lacin, a neurosurgeon. Decedent reported a history of bilateral upper extremity pain and tingling following an August 2001 incident lifting iced tea containers. Decedent failed to report a May 22, 2002 injury and did not complain of back or leg pain. Decedent reported that her symptoms were basically the same as in August 2001 with some weakness of her upper extremities and pain radiating from her neck into her arms. Decedent had left-sided triceps atrophy and weakness as well as a limited cervical range of motion. Dr. Lacin reviewed decedent's MRI, myelogram and CT scan and diagnosed right C6 and left C6 and C7 radiculopathies and recommended surgery. Dr. Lacin anticipated that decedent would remain out of work for two weeks and then return to a light duty position until six weeks post-surgery at which time decedent could return to work full duty.
18. On September 19, 2002, Dr. Lacin performed a C5-6 and C6-7 anterior discectomy. Decedent returned to Dr. Lacin on September 30, 2002 for a follow-up visit. Decedent's symptoms were improved and Dr. Lacin recommended decedent begin walking to increase her stamina. Dr. Lacin requested that she return for x-rays in five weeks.
19. Accordingly, on November 4, 2002, decedent returned to Dr. Lacin and was examined. Dr. Lacin felt that decedent's neck condition was improved and that with respect to her neck she could return to work without restrictions. However, decedent's back, hip and thoracic pain as well as weight loss concerned Dr. Lacin. In addition, decedent's blood work raised questions about a neoplastic disease. Dr. Lacin released decedent with a 5% permanent partial disability to her neck and wrote Dr. Dennis Kuk, decedent's OB/GYN, concerning her other complaints. Following her post-operative visit, decedent sought no further treatment for her neck condition. In addition, regardless of her full duty release with respect to her neck, defendant continued to pay decedent weekly benefits at a rate of $149.34 per week.
20. Decedent was seen by Dr. Dudley Anderson for suspected carcinoma, and Dr. Anderson referred her to Dr. Michael Halpert for a biopsy of the left supraclavicular node. Dr. Halpert noted that decedent had lost approximately 30 pounds over the past several months and performed an excision of a deep jugular lymph node on November 15, 2002. Dr. Halpert diagnosed decedent with lymphoma following the biopsy. Decedent was then referred to Dr. Mark VanBree at Wilson Medical Center. Dr. VanBree reviewed a CT Scan and MRI of decedent's spine and indicated that decedent had a large retroperitoneal mass with possible involvement of the left upper pole kidney. Decedent therefore underwent a left retrograde pyelogram and left ureteral stint placement on December 11, 2002. She began radiation therapy in December of 2002 and later chemotherapy.
21. On December 28, 2002, over seven months after the alleged low back injury, decedent filed a Form 18 for the alleged May 22, 2002 low back injury.
22. On March 24, 2003, decedent saw Dr. Josephus Bloem, an orthopaedic surgeon, for a second opinion evaluation on the disability rating that Dr. Lacin assigned to her neck. Decedent reported her August 1, 2001 injury to Dr. Bloem indicating that as a result of heavy lifting she suffered neck and left arm pain. Decedent did not report a May 22, 2002 injury to Dr. Bloem who indicated that his discussion with decedent was quite difficult as she believed that she was being evaluated for a neck injury as well as a low back injury, which she felt was part of the original August 1, 2001 workers' compensation injury. Decedent reported radiating pain into the left arm and weakness with difficulty lifting and driving. She further described pain, which she felt had been present "all along" at the L4 level of the low back. Dr. Bloem noted decedent had sustained a fracture at L1 related to her cancer and felt that decedent's other complaints were not originating from the L1 level but from other levels of her spine.
23. Dr. Bloem, who has a certification from the American Academy of Disability Evaluating Physicians, examined the I.C. Rating Guide under Ruptured Lumbar Disc, with post-operative removal of a ruptured disc and spinal fusion with significant pain and objective findings allowing a rating of 25% to 30%. Dr. Bloem did not use the portion of the Guide for the cervical spine although the rating was to decedent's neck. Based upon Dr. Bloem's review of the Guide with respect to the lumbar spine and decedent's examination, he assigned a 25% permanent partial impairment to the back as a result of decedent's cervical condition. Furthermore, Dr. Bloem indicated that he would assign a 5% permanent partial impairment rating to the low back but was unsure whether the condition was covered by workers' compensation. Dr. Bloem testified decedent was restricted to light duty work by her neck and low back condition but that her cancer played a large role in her inability to return to work. However, Dr. Bloem deferred to decedent's treating physicians with regard to work restrictions and recommendations for future medical treatment.
24. On May 3, 2003, defendant issued decedent a regular weekly check of $149.34. However, thereafter, defendant unilaterally suspended decedent's benefits and failed to issue further weekly checks at that time. Although defendant had been paying decedent weekly benefits for almost a year, defendant had not yet filed an appropriate Industrial Commission form. Approximately two months and then four months after unilaterally suspending decedent's benefits, defendant paid decedent for back-due benefits at a weekly rate of $149.34 in two lump sums, one in July 2003 and one in September 2003. Thereafter, defendant began making weekly payments to decedent in an increased weekly amount of $175.94 based upon a recalculation of decedent's average weekly wage. The rate of $175.94 per week appears to be an accurate calculation based upon decedent's testimony that she worked between 28 and 35 hours per week at a rate of $8.25 per hour, for an average of 31.5 hours per week. After the recalculation of decedent's average weekly wage, decedent was not paid back due benefits for the difference between $149.34, which was previously paid, and the new rate of $175.94.
25. As a result of defendant's failure to comply with the Act, unilateral suspensions, and erratic payments of benefits, decedent filed a motion for contempt dated September 9, 2003 before Chief Deputy Commissioner Stephen Gheen. Decedent cited defendant's admission of liability pursuant to the Form 33R and defendant's unilateral termination of benefits. However, decedent's motion for contempt was denied because there was no violation of an Industrial Commission Order directing payments and no Award of the Commission. However, as defendant had failed to file appropriate forms, Chief Deputy Commissioner Gheen ordered defendant to do so no later than October 22, 2003.
26. Decedent returned to Dr. Lacin on June 2, 2003 with back pain related to large B-cell type Hodkins' lymphoma. Dr. Lacin's notes do not mention any complaints of neck or arm pain by decedent and she did not request any further treatment of her neck, despite the fact that Dr. Lacin was the treating physician who had performed her cervical surgery. Dr. Lacin noted that decedent had a pathological fracture of the low back at L1 that was related to her cancer and not her injury by accident of August 1, 2001. At this time Dr. Lacin was still unaware that decedent alleged an injury of May 22, 2002. Dr. Lacin reviewed decedent's MRI and found that the L1 fracture was causing stenosis and that decedent had multi-level degenerative disc disease. Dr. Lacin prescribed conservative treatment including injections for decedent's back. All of the treatment that Dr. Lacin rendered for decedent's low back in June of 2003 was as a result of the cancerous condition and not as a result of any other low back pathology.
27. According to Dr. Lacin, decedent's L1 fracture low back condition did not result from or become aggravated by decedent's August 1, 2001 or alleged May 22, 2002 injury. However, in his deposition Dr. Lacin, who was previously unaware of the alleged May 22, 2002 injury, indicated that an incident lifting could have aggravated decedent's low back degenerative changes and caused pain. Regardless, Dr. Lacin's opinion on causation was not to a reasonable degree of medical probability and he indicated that it was a "possibility," which could cause a flare up of pain and which might or might not improve on its own. Dr. Lacin further indicated that because he was unaware of any alleged injury on May 22, 2002, he could not form an opinion as to causation.
28. Dr. Lacin felt that decedent should have been released without restrictions with respect to her cervical injury because of the nature of the cervical surgeries and because decedent did not perform heavy manual labor. Furthermore, Dr. Lacin explained that a cervical injury with a fusion is different from a lumbar injury with a fusion, as the lumbar area bears more weight. Furthermore, Dr. Lacin based his opinion concerning decedent's 5% impairment rating on the I.C. Guide, which provides 5% for an anterior discetomy, with or without a fusion, which was free of neck and arm pain and weakness. Dr. Lacin assigned 5% even though there was a two level fusion based upon his interpretation of the guidelines and the success of plaintiff's surgery. However, Dr. Lacin admitted that there has been some confusion and debate regarding the fact that the Guide does not distinguish between a one level and a two level fusion.
29. Decedent testified at the hearing that she was no longer having any problems associated with cancer in her low back as she no longer had the vertebra at L1. Decedent contended that her low back pain was a different pain which she mainly connected to the original injury of August 1, 2001 and which she indicated was neurological in nature. While Dr. Bloem's testimony supports decedent's contentions to some extent, the greater weight of the evidence is contrary to decedent's contention that her original August 1, 2001 injury resulted in a low back condition or that she sustained a new injury or aggravation on May 22, 2002. Furthermore, the greater weight of the evidence demonstrates that decedent required very little medical treatment as a result of any low back condition other than the one related to her cancer. Moreover, while decedent's cancer, including the L1 fracture, caused disability, the greater weight of the evidence of record fails to demonstrate that decedent was disabled as a result of her other alleged low back condition unrelated to her cancer. Decedent had cancer in her abdomen, which contributed to her disability. Decedent was unable to return to work because of the therapy in which she participated as a result of the cancer, which weakened her immune system.
30. While decedent reported continued neck and arm complaints to Dr. Bloem, the greater weight of the evidence demonstrates that decedent's complaints had resolved for the most part, if not entirely, following the September 2002 surgery. Decedent sought no additional treatment for her neck or arms and her fusion healed well. Furthermore, decedent returned to Dr. Lacin on two occasions following her visit with Dr. Bloem and made no mention of neck or arm difficulties and requested no further treatment even though Dr. Lacin had performed her earlier surgery and was her authorized treating physician. However, considering any possible non-disabling mild residual complaints of pain and the opinions of both Dr. Lacin and Dr. Bloem including their interpretations of the I.C. Rating Guide, decedent sustained a 10% permanent partial impairment to her neck as a result of her injury by accident. The 5% permanent partial impairment rating that Dr. Lacin assigned to decedent's neck is more consistent with the North Carolina Industrial Commission Rating Guide and more accurately reflects the disability that decedent suffered to her neck than the rating that Dr. Bloem assigned to decedent. However, decedent did undergo a two level fusion rather than a single level fusion and a 10% permanent partial impairment is appropriate, considering the greater weight of the evidence of record including the opinion of Dr. Bloem that decedent sustained greater than a 5% rating.
31. Plaintiff's contention that decedent suffered a compensable injury on May 22, 2002 is not supported by the greater weight of evidence in this case. In addition, the greater weight of the medical evidence fails to link decedent's low back condition to her compensable August 1, 2001 neck injury. In fact, both experts who testified in this case, Dr. Bloem and Dr. Lacin, opined that the low back condition was unrelated to the August 1, 2001 neck injury. Moreover, the evidence establishes that decedent's low back condition primarily involved a pathologic fracture, which was related to her cancer. To the extent that decedent suffered from radiculopathies, Dr. Lacin stated that they were possibly also related to her L1 fracture depending on the severity of the fracture. However, Dr. Bloem felt that decedent had a separate process caused by her L4 level, which was unrelated to the cancer. Regardless, the greater weight of the evidence of record fails to prove that any low back condition is related to the August 1, 2001 injury or an alleged May 22, 2002 injury. Any evidence to the contrary is afforded little weight. Plaintiff has failed to meet his burden of proving that decedent's alleged low back condition is related to her August 1, 2001 compensable injury or alleged May 22, 2002 injury.
32. Decedent's disability after November 4, 2002 was unrelated to her compensable injury of August 1, 2001 with defendant-employer. Decedent's inability to return to work was primarily related to the therapy for her cancer, which weakened her immune system. While decedent's low back condition caused some pain, no physician ever removed her or restricted her from work as a result of her low back pain other than Dr. Bloem who was not in the best position to determine decedent's work capacity. Decedent was hospitalized for her cancer and received various treatments for her condition, which she conceded affected her ability to return to work. Dr. Lacin's opinion is given great weight with respect to decedent's ability to return to work with regard to her compensable neck condition. Consequently, plaintiff failed to prove that decedent was disabled beyond November 4, 2002 as a result of her compensable neck condition.
33. With the exception of payment for her impairment rating and payment for the difference between her weekly compensation rates, decedent received all benefits to which she is entitled as a result of her August 2001 neck injury. Decedent's treating physician released her to return to work with no restrictions as of November 4, 2002 and decedent was capable of work with regard to her neck condition after that time. Furthermore, decedent did not receive any medical treatment and was not taken out of work as a result of her neck condition subsequent to November 4, 2002.
34. At the hearing of this matter, defendant moved the Commission to terminate decedent's disability benefits effective October 27, 2003. The evidence established that defendant paid decedent weekly benefits in the amounts of $149.34 and $175.94 per week since June 25, 2002 and September 17, 2003, respectively, and at the date of the hearing defendant continued to pay decedent at a rate of $175.94. Because the evidence establishes that decedent was not disabled as a result of any work-related condition subsequent to her November 4, 2002 full duty release, defendant overpaid decedent for weekly payments made subsequent to that time.
35. Plaintiff contends that decedent's average weekly wage should be calculated based upon decedent's 2001 tax return, which would yield a higher average weekly wage and corresponding weekly compensation rate. However, decedent's injury occurred on approximately August 1, 2001 and decedent worked for defendant-employer for the remainder of 2001. Furthermore, the 52 weeks prior to decedent's injury date back into the tax year 2000. Decedent's income tax return for 2001 cannot be used to appropriately calculate decedent's average weekly wage.
36. Based upon the greater weight of the evidence, decedent's average weekly wage was $263.90, yielding a weekly compensation rate of $175.94. While decedent received an underpayment of benefits for the weeks when she was paid at a rate of $149.34, defendant overpaid benefits after November 4, 2002.
37. Defendant failed to comply with the law and Industrial Commission rules and failed to file or timely file required Industrial Commission forms. Defendant failed to file a Form 19 concerning either of decedent's claims. In particular, defendant was obligated to file a Form 19 with respect to decedent's August 1, 2001 injury to her neck. However, with regard to decedent's claim for her low back injury, a Form 19 was not required, as the greater weight of the evidence fails to demonstrate that decedent missed more than one day of work as a result of the alleged low back injury and that defendant paid in excess of the requisite dollar amount of medical expenses necessary to trigger the filing requirement for a Form 19. Furthermore, defendant failed to timely file a Form 60 concerning decedent's August 1, 2001 injury and failed to timely file a Form 61 concerning decedent's May 22, 2002 alleged injury. In fact, defendant violated an order of the Commission by failing to file the Form 60 concerning decedent's August 1, 2001 injury and the Form 61 concerning decedent's alleged May 22, 2002 injury until approximately five days after the date allowed by Chief Deputy Commissioner Gheen's October 9, 2003 Order which required that the forms be filed no later than October 22, 2003.
38. Although defendant failed to comply with Industrial Commission procedures and an Order of the Commission, defendant nevertheless defended this matter upon reasonable grounds. However, defendant's failure to comply with the Act and to file or timely file appropriate forms resulted in additional expenditures of time on the part of plaintiff's counsel and frustrated the workers' compensation process and the intent of the Act. In addition, defendant's failure to timely file forms and their corresponding unilateral action prevented decedent from having necessary protections and prompt remedies afforded by the Act.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Decedent sustained a compensable injury by accident to her neck on August 1, 2001. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has failed to prove by the greater weight of the evidence that decedent sustained a compensable injury by accident to her low back on August 1, 2001 or May 22, 2002 or that she materially aggravated a pre-existing low back condition as a result of a work related injury on either August 1, 2001 or May 22, 2002. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff has failed to prove that decedent was disabled as a result of her compensable neck injury beyond November 4, 2002. Any disability following that date was due to reasons unrelated to her compensable injury by accident. As decedent's disability subsequent to November 4, 2002 was unrelated to her compensable injury of August 1, 2001, decedent has received an overpayment of temporary total disability benefits for which defendant is entitled to an offset or credit against all further benefits owed. N.C. Gen. Stat. §§ 97-29; 97-42.
4. Decedent's tax return for the year 2001 is not appropriate to use in calculating decedent's average weekly wage based upon her August 1, 2001 injury by accident. Furthermore, plaintiff failed to demonstrate that any method other than the first method of calculation should be used to determine decedent's average weekly wage. On the Form 60 filed on approximately October 29, 2003, defendant calculated decedent's weekly compensation rate as $175.94 based upon her salary and hours for the 52 weeks prior to her August 1, 2001 injury. Considering decedent's hourly rate and average hours worked per week for the 52 weeks prior to her injury, this average weekly wage and compensation rate is fair and just to the parties. N.C. Gen. Stat. § 97-2(5).
5. While decedent received an overpayment as a result of defendant's continuing to pay weekly benefits beyond November 4, 2002, decedent also was underpaid, as she was originally paid benefits at a weekly rate of $149.34 until approximately September 17, 2003, at which time decedent was not paid back due benefits after the recalculation of her weekly compensation rate. Plaintiff is entitled to have decedent's earlier weekly payments of $149.34 supplemented as a result of her correct weekly compensation rate of $175.94, subject to defendant's entitlement to a credit for overpayments made after November 4, 2002. N.C. Gen. Stat. §§97-2(5); 97-29; 97-42.
6. Considering the greater weight of the medical evidence of record and the Industrial Commission Rating Guide, decedent sustained a 10% permanent partial disability to her back as a result of her August 1, 2001 neck injury for which she was entitled to 30 weeks of permanent partial disability at a weekly rate of $175.94, subject to defendant's credit for overpayment of weekly benefits. N.C. Gen. Stat. § 97-31(23).
7. Plaintiff is entitled to payment of expenses for any reasonably necessary medical treatment incurred as a result of decedent's compensable neck injury of August 1, 2001. Defendant is not entitled to a credit for any medical expenses voluntarily paid without an admission of liability with regard to diagnosis or treatment of decedent's low back condition. N.C. Gen. Stat. §§ 97-25; 97-25.1.
8. Defendant failed to file or timely file forms including a Form 19, a Form 33R, and a Form 60, all with regard to decedent's neck injury, and a Form 61 with regard to decedent's alleged low back injury. Furthermore, defendant failed to comply with the October 9, 2003 Order of the Commission in violation of Industrial Commission Rules. Consequently, in the discretion of the Commission, appropriate reasonable sanctions should be assessed against defendant including sanctions to be paid to the Commission as well as reasonable attorney's fees to be paid to plaintiff's counsel. N.C. Gen. Stat. § 97-18; Industrial Commission Rules 104, 601, 603, and 802.
9. Defendant defended this matter on reasonable grounds as there were legitimate issues for hearing. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to an offset for the overpayment of benefits paid beyond November 4, 2002, defendant shall pay plaintiff for any underpayment of benefits resulting from the earlier weekly payments made at the lesser weekly compensation rate of $149.43, as decedent's earlier weekly benefits were never supplemented following the re-evaluation of decedent's weekly compensation rate of $175.94, subject to a reasonable attorney's fee awarded below.
2. Subject to an offset for the overpayment of benefits paid beyond November 4, 2002, defendant shall pay plaintiff permanent partial disability benefits at the rate of $175.94 per week for a period of 30 weeks as a result of decedent's 10% permanent partial disability rating, subject to a reasonable attorney's fee awarded below.
3. Defendant shall pay for any reasonably necessary medical treatment incurred as a result of decedent's compensable neck injury of August 1, 2001.
4. To the extent, if any, that plaintiff is entitled to any further indemnity benefits after defendant's offset for their overpayment, plaintiff's counsel is entitled to a reasonable attorney's fee in the amount of 25% of any remaining net amount due plaintiff.
5. Defendant shall pay reasonable sanctions of $2,500.00 to the Industrial Commission for failure to file or to timely file required forms and for violation of an Industrial Commission Order.
6. Defendant shall pay reasonable attorney's fees to plaintiff's counsel pursuant to Rule 802(1) in the amount of $3,750.00. No attorney's fee assessment is awarded pursuant to N.C. Gen. Stat. § 97-88.1 as this matter was defended upon reasonable grounds.
7. Defendant shall pay all costs due the Commission and all expert witness fees, if not already paid pursuant to prior orders.
This the 20th day of December 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/mlb